UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

MADHUKAR RANA,

               Plaintiff,

   v.

BAINS INVESTMENTS,
INCORPORATED, a Washington
corporation, d/b/a FLYING B7
GAS STATION, and GAGANDEEP
BAINS, individually,

              Defendants.

No. CV-10-370-JPH

ORDER FOLLOWING BENCH TRIAL

**CLERK'S ACTION REQUIRED**

THE COURT conducted a bench trial on February 14-15, 2012. The parties consented to proceed before a magistrate judge, ECF No. 22. Plaintiff, assisted by an interpreter, appeared with counsel, Patrick Pleas and Gary Smith. Defendant Gagandeep Bains appeared and represented himself and the corporate defendant.

The Court conducted voir dire of the interpreter and determined he is qualified to interpret for the Plaintiff in Nepali during the trial. The interpreter was sworn by the Court.

Defendant filed an untimely motion to continue the trial. Plaintiff did not receive prior notice of the motion. The Court denied the motion, noting prior continuances had already been granted and it would be unfair to Plaintiff to grant yet another continuance.

The Court preliminarily ruled on the admissibility of exhibits and ordered witnesses excluded.

1

Plaintiff waived opening statement. Defendant made an opening statement.

**WITNESS No. 1: MICHELLE KULTGEN** (SWORN)

She worked at Flying B7 beginning in February 2007 for the prior owner (prior to Defendant Bains, who she calls "Deep"). Plaintiff Rana was hired by Bains in October 2008. Bains told her to teach Rana how to clean the store and run the register. At the same time, Raj (Kedar Shrestha), also from Nepal, was hired by Bains. The witness never trained or scheduled work hours for Raj's wife, Swehdi, who did not speak English and never worked at the Flying B7. The witness trained Rana how to do the "end of day reports," showing the day's cash balance. The witness worked with Rana and Raj on December 5,10,11,15, 16, and 17, 2008, as the manager. (Ex. 11-17). Rana and Raj were paid in cash. "Sanjay," who worked at the gas station down the street (Flying B#6) would tell her to pay them. Ex. 18: reads "pay per Deep"; Bains told the witness to pay Rana and Rana signed that he received $300 cash on 12/19/2008. The witness did not recall how many hours she scheduled for Raj and Rana, but she gave them one day a week off, and breaks; however, Deep (Bains) told her they needed to work from open to close, 5 am to 10 pm, with no breaks.

"Preet" and Daljit" told her not to pay for more than 80 hours a week by check, in other words no overtime was allowed. In December 2008, she was let go by Deep. He said he did not need her anymore. Her final check was for 40 hours of work although she worked 80 hours. Raj, Rana, and Ross were working there; and Veronica worked at both stores. Deep told her to let the other employees go.

Ex. 49 p. 42: The witness testified this is the L and I complaint she filed on 1/13/09. Attached to the complaint are work schedules she had copied from the store file. The witness testified that after investigating her complaint, L and I found she was owed about $1500 by the Flying B7.

Ex. 49 p. 48: Plaintiff testified the work schedule dated November 17-23, 2008, includes Rana and Raj and the hours they worked that week.

After the witness was fired, Raj and Rana called her daily for about a week asking how to do the cashier report at the end of the night. Raj called more than Rana because Rana was just learning English.

Ex. 101: the witness re-copied her copies of the hours worked by Rana before she was fired, i.e., Ex. 101 is a copy of Ex. 49.

Upon questioning by the Defendant, the witness testified she has not been involved in a conspiracy against Deep. No one under her control has tried to shoot him.

Ex. 49, p. 3: L and I found $1528.34 in unpaid wages is owed to her by the Flying B7.

Ex. 48, p. 3: employee time records - originals of the first two weeks in the pay period before the witness was fired; the schedule for the last two weeks are based on the hours Raj and Rana told the witness they worked. She left the original time records in the gas station when she left employment.

She testified she helped prepare Defendants' Ex. 101 with assistance from Raj, Plaintiff, and "Patricia."

3

**WITNESS 2: GAGANDEEP BAINS** (SWORN)(by Gary Smith)

Bains acknowledged he was the sole owner of Flying B7 gas station during the time Plaintiff claims he was employed there.

In his deposition on 7/28/2011, Bains admitted he was not involved in the day to day details of operating the Flying B7. He delegated those responsibilities to the managers (collecting time records, hiring, firing). Previously, Bains said he never spoke to Plaintiff. Bains tried to speak with Rana but could not understand him due to the language barrier. Bains does not recall ever giving Rana anything in writing. Raj was the manager after Michelle was let go or until February 2009.

Page 59 line 2, of deposition: Raj had Rana working at the store, according to Bains. Did you ever see Michelle's records showing Rana worked at the store before the lawsuit was filed? "No." (In October of 2010 when suit was filed, Bains knew Rana and Raj were working there based on the attachments to Michelle Kultgen's lawsuit).

Bains: around the time the suit was filed, he had "health issues/pain pills, and out of country for that." Counsel refers Bains to Ex. 49, pages 43-50 (records attached to Kultgen's L and I complaint, of which Bains was presumably aware).

Bains does not recall telling L and I that he paid Kultgen everything and owed nothing . . . "Why should we pay overtime wages when we can pay minimum wage?" In Bains' deposition, Bains said "if you can't keep payroll down, you're not going to be able to make the kind of money that needs to be made."

In Bains' deposition, he admitted "Joshi" (Nabin Joshi) was

4

trying to find Nepali workers new to the country to work in Bains' store. In Court, Bains says Joshi is not his friend and Bains does not discriminate in who he hires. However, in his declaration (Ex. 50), he said Joshi was his friend.

Bains' statement (in ECF No. 57 opposing summary judgment) (Plaintiff's Ex. 50 at page 5, signed 8/25/11) indicates he did know Joshi was trying to find Nepali workers. Deposition at page 32: Bains said he had heard that Joshi brought over guys from Nepal looking for jobs and those guys "work out real well." In his deposition Bains said Joshi dropped off two Nepalis at the B7 store before Bains got there. At his deposition, Bains said he paid rent and food for the two and took no written applications, and did not report their employment to L and I.

Bains said Rana could not work there until he learned English. Bains hired Raj's wife without meeting her. Any evidence Raj's wife worked there? "No."

By the end of December 2008, were all of the locals fired? Bains: "Michelle was the last one there."

Bains has said Michelle was part of a conspiracy. "Phone calls from unnamed sources that when Michelle was manager, people told him the store was not open on occasions." Bains says he told Michelle  she would be fired if store wasn't kept open. Michelle's mother called Bains and was "threatening." Bains did not fire Michelle then.

A second threat was made by Michelle's mother. Bains was very sick and out of the country most of the time when the lawsuit was filed. Someone - Raj - said a gunshot was fired. In his deposition,

5

Bains said a shot was fired at (him) Bains.

**WITNESS #3: CHRISTOPHER ROSS BLESSING** (SWORN)

The witness (Ross) knows Bains through the Flying B7. He only knew Bains was the owner because Michelle told him that Bains was the owner. Ross was hired in late February 2008 as a cashier-stocker. He worked there 5-6 months. Ross worked with Rana in early November of 2008. Rana came into the store with Bains, Raj, and Sanjay. Bains told Ross he was to train Rana and Raj. Ross trained them to stock and clean. A short time later, Ross (who worked every other day) saw both Raj and Rana in the store often. Ross worked 6-8 hour shifts, and he worked with Rana for about 3 weeks. Michelle "let him go" around Thanksgiving. Ross thought it was because he wanted the holiday off, and Ross was told Raj and Rana were taking over. Did Rana have a schedule? "Not set." Rana spoke only a little English. Raj and Rana could run the store except for the language problem. Ross mostly worked the night shift, and some mornings. He worked less than 40 hours a week.

**WITNESS #4: MAHDUKAR RANA** (SWORN)

Plaintiff has worked at Safeway for "a long while." He came to the United States on Nov. 6, 2008, on a "diversity visa." His younger brother told him "pay money and get a job." Rana paid $3,200 to Viday for a job. Rana came to the United States from Nepal. He met someone in Bangkok, and in Seattle was picked up by Nabin Joshi and taken to Ellensburg in an RV. He was there for a week before he moved to Moses Lake to work. Nabin Joshi drove him, in a Jeep, along with Joshi's sister and wife, to the Flying B7 in Moses Lake. Rana speaks Hindi.

6

Bains, Sanjay and Joshi spoke in Hindi in the B7 parking lot after they arrived. Rana could hear some of the conversation. Told they would work 6 days a week, 10 hours a day. Bains took them inside the station. Bains talked to Blessing (Ross) and then Bains left the store. Ross had Rana fill ice, change gas prices, and clean. After a while Ross left and Michelle arrived. She taught them "long"; Rana worked 9 hours the first day.

Rana worked at the B7 from November 20, 2008, through February 21, 2009. Michelle wrote out the schedule and posted it on the wall. He worked until midnight, one a.m., and another late hour, often. Rana worked with Raj through all shifts until Raj got sick [with gangrene]. When Michelle was manager Rana worked 9 hour shifts. Ever longer? Yes, when Michelle left and Raj was ill, Rana worked long hours. He stocked, cashiered, priced, did everything. The night Raj went to the hospital, Rana went there too and stayed late into the night. He fell asleep and was awakened by "Sanjay" telling him to open the store; that the owner was annoyed.

Rana testified Exhibit 42, dated 1/2/09 and 1/21/09 shows "pay outs" and daily transaction receipts showing Rana paid for the delivery and signed it. Sanjay (Saini) told Rana to call him, Sanjay, not Bains, if he had questions.

Ex. 47: 1/27/09 Grant Co. Health District inspection report. A lady came in while Rana was working and told him not to serve food and to give the paper to the owner, which he did. Rana signed it in two places.

For his work, Rana was not paid in time. Joshi, Rains, and Rana

7

had a conversation. Ross paid Rana and Raj each $100 cash and asked them to sign for it.

Ex. 18: 12/19/08 Payout. Joshi came and talked to Michelle and told her to pay Raj and Rana $300 each. Rana signed the bottom only. He was paid $700 also, once (Ex. 21, dated 12/31/08), signed by Rana. He had been told his salary would be $1000 per month, but they were not paid $1000 until they had worked one and a half months. Rana stopped working there in February of 2009. He was paid almost $2400 all months of work. When Raj was sick Rana thought he worked alone for 2-3 weeks. He worked from 6 am until midnight or one a.m. When the store was under repair, he worked until ten or eleven p.m.

How did the job end? Rana was told he was being "sacked." He was not fully paid after being fired. Did you try to get paid the money you were owed? Yes, but was told "if money was not made how could he pay us?" Joshi did not answer calls. Later Rana learned employees were supposed to be paid minimum wage plus something more for overtime. He made a record of the hours he worked, compiling it with Michelle and Raj's help. The hours he worked during Raj's illness are not included, neither are the hours he worked when the store was being repaired (gas pumps, etc.). A letter dated July 12th reflects when the pumps were being repaired.

Rana testified Raj had a record of the hours they worked, and Raj started it when they first began working. Raj wrote when the two of them got to the store and when they left, until his illness. Rana lost his.

Ex. 101- some writing is Rana's and some is Michelle's, on the

8

work calendar they created. On cross, Bains asked if Rana had been cited for "loitering" at a neighboring market (Leprechaun Market) during a day when he was supposed to be working.

**WITNESS No. 5: ROLANDO GARZA** (SWORN)

Mr. Garza was a daily customer at the B7. He saw Rana working there over a period of 3 months. Garza went to Rana's apartment. He saw Rana had no food and took him groceries and fruits and vegetables.

**WITNESS No. 6: PATRICIA WRIDE** (SWORN)

Ms. Wride is a missionary and advocate outbound from India. She first met Rana on January 25, 2009, when she began caring for Raj for a month when he got out of the hospital. She treated the gangrene in his foot, with herbal and other remedies, five times a day. She saw Rana at the store daily. She helped prepare records of hours worked (Ex. 101), including February 8-16, 2009. Page B11 0140 of Ex. 101 is her handwriting. She learned that neither Raj nor Rana had a green card or health card for food handling. She later assisted them in obtaining those. She learned that when Raj and Rana were paid, it was in cash and under the table. She brought food, medical, and cleaning supplies to Rana and Raj's apartment. She feared they were victims of human trafficking.

**WITNESS No. 7: DELANA GENTRY WILLIAMS** (SWORN)

Ms. Williams worked at the B7 store from August-November 2008. She worked 40 hours a week. She was always paid in cash, and was told no extra rate was paid for overtime. Rana and Raj always worked together because one could make change and the other spoke better English. She knew Raj and Rana were struggling because they could not

9

afford to buy soap.

Plaintiff rested his case in chief.

**DEFENDANT BAINS** (SWORN)

Defendant came to the United States from India in 1987 and drove a taxi until he bought a gas station in 1996. In 2005 or 2006, he formed Bains Investments, Inc., and he is the sole shareholder. Bains has owned a total of 11 or 12 gas stations/convenience stores. He now owns Flying B1 and B9. In 2001 or 2002, he bought the Flying B7 with his brothers, but by 2008 he was the sole owner. In 2008, the gas was Shell. In the fall of 2008, the B7 had 4 to 5 employees. In the fall of 2008 it was open from 6 am to 9 pm, 7 days a week.

In September or October Bains learned the employees were not keeping store hours. This was before Rana arrived. He was told this by vendors. Michelle made excuses. Bains talked to her but it did not change. In the fall of 2008 Bains does not remember how often he visited the store.

Bains testified it has never been the policy to pay cash for overtime. The only records are the records here (in court) - "somebody seriously played with the records." Employees were paid in cash out of the register instead of by check. Bains said this was because the managers did not have signing authority on his account and employees would turn a check into cash out of the register anyway. He got a call from Joshi looking for jobs for the Nepalis. They started about two weeks after the call. He thought Rana was a woman based on the first name.

Bains remembers when the people from Nepal arrived, he thinks it

10

was November 13, 2008. Bains came to the store and he thinks the Nepalis were there. Ross was working. Bains told Ross he was going to be training some people. Bains did not discuss pay with Ross or with the Nepalis. Bains discovered immediately that Rana could not speak English or Hindi. Bains thinks he said Rana could not work at the B7 because of the language problem. Bains thought the diversity visa required basic English and a twelfth grade education, similar to what is done in India. Bains told Raj that Rana could stay with Raj, and Bains would hire Rana when he learned English.

Sometime after the day that he hired Raj, Bains returned to the store again, maybe a month later. He thinks it was after he fired Michelle. On one visit Bains saw Rana standing behind the counter and told Raj it was an insurance liability. Bains said he first learned Rana was working at the B7 when this lawsuit was filed in 2010.

Bains was upset the store was closed and fired everybody except Raj and Raj's wife. Records were kept in the store but Bains did not look at them. Bains fired Michelle in December, the 21st, of 2008.

Some people "brainwashed" Bains' sister with their religion. They tried to put Bains out of business. Baines thinks Michelle is one of them, and Patricia Wride is another.

**DEFENSE WITNESS No. 1: NABIN JOSHI** (SWORN)

Joshi picked up Rana and the others and they stayed with him at his place for a week or so. He took them to the Space Needle. Eventually he took them to the B7 in Moses Lake. He remembered that Bains told him he could not hire Rana because of his limited English.

**DEFENSE WITNESS No. 2: SANJAY SAINI** (SWORN)

11

He testified he never gave direction to the plaintiff at Flying B7 or told him to pay himself by taking money out of the till. He never told the plaintiff to open or close the store. He said he never saw the plaintiff working at Flying B7, although he saw him there.

Defendant asked to call a witness in Spokane, Narayan ("Nick") KC, to testify the following morning, February 16th. KC is the person Bains alleges fired Rana. Because Bains admitted he does not know what KC would testify about, the Court denied Bains' request. Plaintiff did not present rebuttal witnesses. The Court ruled the testimony was concluded.

Mr. Pleas gave closing argument.

Mr. Bains gave closing argument.

Mr. Pleas made his rebuttal closing argument.

Mr. Bains made a sur-rebuttal closing argument.

The Court admitted exhibits 3-5, 7-19, 21-23, 42, 47-49,101-119. The Court took the matter under advisement.

**FINDINGS AND DECISION**

<u>Credibility of Witnesses</u>

The Court finds that the plaintiff and the witnesses called by him are credible. Although the dates that plaintiff worked at the Flying B7 are somewhat vague at the beginning and end of the employment relationship, all of the plaintiff's witnesses testified that plaintiff worked there and that he worked long hours, often in excess of forty (40) hours per week. Michelle Kultgen, although embroiled in a Labor and Industries dispute with defendant Bains, appeared to the Court to have no bias regarding her testimony

concerning plaintiff's claims. Patricia Wride also demonstrated that she had only humanitarian interests in mind while assisting the plaintiff and Mr. Shrestha. The Court was impressed with the uniform testimony of all of the plaintiff's witnesses indicating that plaintiff worked at Flying B7 during the times described.

Conversely, the Court does not find the defendant Bains credible. As an experienced business owner in Washington state for many years before the plaintiff ever came to the U.S., he is presumed to know what the labor and employment laws are governing his businesses. He had to know that plaintiff was working at the station after he fired Michelle Kultgen since no other employees except Raj were retained there. He apparently used his business associates, Sanjay Saina and Narayan KC, to direct his "employees" and to terminate the plaintiff's employment. The Court does not believe the defendant's testimony about "someone" seriously disturbing the records of hours worked by employees at the store. Maintenance of such records is the employer's responsibility. Mr. Bains is not credible when he attempts to concoct a story about a "conspiracy" among all of the plaintiff's witnesses to defeat him in this lawsuit. While it may have been true that the Flying B7 was closed at regular business hours at times during the term of plaintiff's employment, such closures were not of his making and would be related to the hospitalization of Raj or just the need for rest by the station employees due to the exhaustive hours the defendant demanded the employees work. Finally, defendant's testimony in trial was both conveniently vague and deliberately evasive.

///

13

EMPLOYMENT RELATIONSHIP

The Court finds that plaintiff was hired by the defendant on November 13, 2008, and that the employment was terminated on February 22, 2009. The Court finds that Ex. 101 is the best evidence of the dates and times when plaintiff worked for the defendant. The Court has adjusted the start date at variance with the exhibit by two days since the evidence appears to justify that. The Court also credits against the plaintiff's claims the sum of $2400.00 for payments plaintiff received in cash during his employment and finds that those cash payments were authorized by the defendant or his agents.

VIOLATIONS OF LAW

The Court finds that the defendant violated the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et. seq. By failing to pay the plaintiff minimum wage and overtime. Additionally, the defendant failed to comply with record keeping requirements under 29 U.S.C. 211 (c) and the regulations promulgated thereunder.

Additionally, the Court finds the defendant violated Washington state wage laws found at Chapter 49 RCW (RCW 49.46.005 et. seq.). Defendant failed to pay the state minimum wage of $8.07 per hour until 12/31/2008 and $8.55 per hour until the end of plaintiff's employment. Further, defendant violated state overtime laws by failing to pay plaintiff for work in excess of forty hours per week at one and a half times the regular rate of pay. The Court accepts the calculations presented by the plaintiff after adjusting for the two days at the start of employment.

14

DAMAGES AND ATTORNEY FEES

Plaintiff is entitled to either liquidated damages under Federal law or exemplary damages under Washington state law. The Court finds that defendant acted wilfully in depriving the plaintiff of his wages and overtime pay. Defendant did not assert any affirmative defense that he acted in good faith or was simply careless or negligent in maintaining plaintiff's employment records. It is clear from the evidence that defendant had actual knowledge or implied knowledge through his managers that plaintiff was being paid infrequently and "under the table" in cash and, given his extensive business experience, defendant simply knew better than to conduct his business the way it was done. Therefore, for the period of employment, defendant is liable to plaintiff for a judgment for twice the amount of the wages plus the costs of the lawsuit and attorney's fees. RCW 49.52.050; RCW 49.52.070.

The Court finds the defendants are jointly and severally liable for the judgment.

**THEREFORE IT IS ORDERED THAT** the plaintiff prepare proposed findings of fact and conclusions of law and a judgment consistent with this opinion and the Joint Pretrial Order (ECF No. 111) and that

IT IS FURTHER ORDERED that the case is set for a one hour telephonic hearing on **Friday, March 2, 2012, at 11:00 a.m.**, for consideration of presentation of findings of fact, conclusions of law, and entry of judgment.

**IT IS SO ORDERED**. The District Court Executive is directed to

15

enter this Order and forward a copy to the parties.

DATED this 16th day of February, 2012.


                                    S/ James P. Hutton
                              JAMES P. HUTTON
                        UNITED STATE MAGISTRATE JUDGE

ORDER FOLLOWING BENCH TRIAL - 16