UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

MADHUKAR RANA,

          Plaintiff,

   v.

BAINS INVESTMENTS,
INCORPORATED, a Washington
corporation, d/b/a FLYING B7
GAS STATION, and GAGANDEEP
BAINS, individually,

          Defendants.

No. CV-10-370-JPH

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

**BEFORE THE COURT** are proposed findings of fact, conclusions of law, and a judgment, proffered by Plaintiff on March 2, 2012 (ECF No. 130). Defendants timely filed their proposed findings (ECF No. 133).

The Court conducted a bench trial on February 14-15, 2012, ECF No. 126. The parties consented to proceed before a magistrate judge, ECF No. 22. Plaintiff Madhukar Rana was represented by Patrick M. Pleas and Gary M. Smith, Northwest Justice Project. Defendants appeared pro se through Defendant Gagandeep Bains.

## I. BACKGROUND

Although Defendants appeared pro se at trial, they were represented by Robert R. Siderius, Jr., Jeffers, Danielson, Sonn & Alyward through the pleading, pretrial, discovery, summary judgment and mediation stages. The Court granted Mr. Siderius's motion to withdraw first as Mr. Bains' counsel and later as counsel for Bains

1

1 Investments, Inc.

2   There is a joint pretrial order containing stipulations of fact

3 (ECF No. 111) that reduced the issues for trial to the questions of

4 whether Plaintiff was employed or suffered to work by Defendants, and

5 if so, the amount of his damages. Bench trial in this case was

6 originally scheduled in October 2011, but was continued shortly after

7 that date to allow for an unsuccessful attempt at mediation.

8   After the withdrawals of defense counsel were approved, the Court

9 held a trial scheduling conference call with the parties on December

10 20, 2011. Mr. Bains attended the conference call for Defendants. The

11 Court proposed a rescheduled trial date for the third week of January

12 2012. Mr. Bains asked for an additional delay so he could seek

13 replacement counsel or otherwise prepare for trial. The Court then

14 proposed trial begin a month later, on February 14, 2012, to allow the

15 parties about seven weeks of additional time. All parties found the

16 date acceptable. The Court scheduled trial to begin at 9:00 a.m. on

17 February 14, 2012.

18 *Untimely motion for continuance*

19   On the morning of trial Mr. Bains immediately moved to continue

20 the trial to allow him additional time to seek counsel and to prepare.

21 He also requested a jury trial. The Court reminded him he had agreed

22 to the trial date, and the motion for a jury trial had previously been

23 denied (ECF No. 30). The Court denied the motion.

24 *Bench trial*

25   Plaintiff presented testimony from six witnesses, including Mr.

26 Bains on cross-examination. The Court admitted Plaintiff's proposed

27

28   2

exhibits. Plaintiff rested during the morning session on February 15, 2012.

Defendant's case in chief consisted of the testimony of Mr. Bains and two witnesses. Defendant sought a continuance to allow a third witness to testify, but that motion was denied when Mr. Bains admitted he had no idea what testimony the witness might be able to present. The sole defense exhibit admitted was Defendants' Exhibit 101, admitted by agreement in the joint pretrial order (ECF No. 111). The parties presented final argument. Trial ended the afternoon of February 15, 2012.

*Court's ruling*

On February 16, 2012, the Court, in an Order Following Bench Trial (ECF No. 127) ruled in favor of Plaintiff on the issues identified for trial, finding that Defendants had employed Mr. Rana and that Mr. Rana's record of his hours worked while employed by Defendants (Exhibit 101) constituted the best evidence of his uncompensated regular and overtime wages. The Court also found that Defendants wilfully deprived Mr. Rana of his wages for this work, so that he was entitled to recover twice the unpaid wages, in addition to the costs of the law suit and attorney fees. The Court directed Plaintiff to prepare proposed findings of fact and conclusions of law and a judgment consistent with the Order Following Bench Trial (ECF No. 127) and the Joint Pretrial Order. The Court granted Defendants' oral request for additional time to file objections and/or proposed findings of fact, conclusions of law, and proposed judgment (ECF No. 132).

The Court, having reviewed the pleadings and stipulations in the pretrial order, presided over the proceedings including the trial, heard evidence and arguments of the parties, reached a decision, and considered the proposed findings and conclusions of both Plaintiff and Defendants, makes the following Findings of Fact and Conclusions of Law:

## II. FINDINGS OF FACT

At trial, Plaintiff established by a preponderance of the evidence that:

1.   Defendant Bains Investment, Inc., owned and operated a gas station and mini-mart business known as "Flying B7" (hereafter B7) at 2777 West Broadway, Moses Lake, WA, from March 2007-August 2010.[1]*

2.   During the period in which Bains Investment, Inc., owned and operated the B7 station, Defendant Gagandeep Bains (Bains) was the sole owner and officer of Bains Investment, Inc.*

3.   During the period of November, 2008 through February, 2009, no person in authority with Bains Investment, Inc., exercised more responsibility over the day to day operations of the corporation than Bains.

4.   Bains is the sole shareholder of Bains Investment, Inc. (ECF No. 127 at 10.)

5.   Bains has owned a total of 11 to 12 gas stations and convenience stores since purchasing his first gas station in 1996. (ECF No. 127 at 10.)

---

[1]Findings and conclusions marked with an asterisk "*" were stipulated to by the parties in the December 20, 2011 Joint Pre-Trial Order (ECF No. 111) pursuant to LR 16.1(B).

4

6.    Bains purchased the B7 gas station and convenience store in Moses Lake in 2001 or 2002.

7.    Bains, an experienced business man, presumptively knew the labor and employment laws that govern his business. (ECF No. 127 at 13.)

8.    Bains was not involved in the day to day details of the operation of the B7 and he delegated those responsibilities to the store manager including collecting employee time records, hiring, and firing store employees. (ECF No. 127 at 4.)

9.    During the months of November 2008-February 2009, the B7 business was supposed to open by 6:00 a.m. every day of the week.*

10.    During the months of November 2008-February 2009, the B7 was supposed to close no earlier than 9:00 p.m. every day of the week.*

11.    During the months of November 2008-February 2009, the B7 was not allowed to close at any time between the scheduled opening and closing times.*

12.    During the months of November 2008-February 2009, Defendants' customary practice was to staff the B7 with only one employee per shift except during a 30-45 minutes overlap between the morning and afternoon shifts when register change over and shelf stocking would occur.*

13.    Customarily, some employees of Defendants' B7 location were paid via a formal payroll process through Defendants' then-bookkeeper, Sandi Buzzard.*

14.    For these employees, the bookkeeper would receive the manager's summary of the hours for which that employee was to be paid during

5

that pay period by fax from the station.*

15.  Former B7 store manager Michelle Kultgen testified that Defendants had a no-overtime policy, pursuant to which no employee was to be paid for more than 80 hours during the two-week pay period. Former store employee Gentry Williams testified she learned of Defendants' no-overtime policy when she was not paid the overtime rate for overtime, and she made certain thereafter to work no more than 40 hours per week.

16.  Defendants' B7 business also operated a cash system by which employees were paid in cash from the register drawer.*

17.  The only record of pay provided in cash from the B7 drawer to employees were receipts bundled with the station's daily transaction records. The employee paid in cash was supposed to sign and date a receipt when being paid in cash from the B7 register drawer. Those receipts would then be included with the customer charge slips, vendor bills, daily register report, and cash reconciliation record that made up the daily transaction record for each day the B7 did business.*

18.  At all relevant times, it was Defendants' customary practice to retain the original paper records of employee rime cards, manager summaries, work schedules, and daily transaction records at the B7 location.*

19.  In November 2008, Nabin Joshi, a Nepali citizen, took Plaintiff, Mr. Rana, and Mr. Shrestha, who had both recently arrived in the United States from Nepal, to the B7 station in Moses Lake where they were hired by Defendant Bains. (ECF No. 127 at 6-7.)

20.  Bains personally instructed B7 employee Christopher Ross

Blessing (Ross) to train Rana and Shrestha as cashier-clerks. Ross worked with Rana during Ross's shifts during the next three weeks, by which time  Rana could run the store except for his limited English.

21.    B7 employee Gentry Williams worked multiple shifts during a one-month period with Rana and Shrestha, training them to perform multiple cashier-clerk duties. During that period, Williams saw Rana working 12 to 16 hours per day, from the time the store opened until it closed.

22.    Bains personally informed store manager Kutlgen that he had hired Rana and Shrestha, and Kultgen was to train them to work at the B7. (ECF No. 127 at 2.)

23.    Manager Kultgen scheduled Rana and Shrestha to work at the B7. Initially she gave them each one day off per week. Later, Bains personally instructed her that the two men must work every day of the week from the 5:00 a.m. opening to the 10:00 p.m. closing. (ECF No. 127 at 2.) Bains also told Kultgen to train Shrestha to perform the duties of store manager.

24.    Manager Kultgen trained Rana and SHrestha to complete the end-of-day reports showing the B7's daily cash balance, which indicate she worked with Rana and Shrestha at the B7 on December 5, 10, 11, 15, 16 and 17 of 2008 (Exhibits 11-17). (ECF No. 127 at 2.)

25.    Bains instructed Kultgen to pay Rana and Shrestha from the cash register and leave a pay out note reflecting the amount paid to them. (ECF No. 127 at 2.)

26.    On December 19, 2008, per Bains' instructions, Kultgen paid Rana three hundred dollars cash ($300), had Rana sign the bottom of a pay out note, and left the pay out note with the cash register receipts

7

for that day (Exhibit 21). (ECF No. 127 at 8.)

27.    On December 31, 2008, Rana was paid seven hundred dollars cash ($700) and signed a pay out note that was left with the cash register receipts for that day (Exhibit 21). (ECF No. 127 at 8.)

28.    In late December 2008 Bains fired Kultgen and all local B7 employees. (ECF No. 127 at 7, 11).

29.    When Bains fired Kultgen, he knew Rana was working at the B7 because no other employees except Shrestha were retained. (ECF No. 127 at 13.)

30.    Bains promoted Shrestha to the manager of the B7. (ECF No. 127 at 4.)

31.    Bains admitted knowing that Shrestha, after his promotion to on-site manager, had Rana working in the B7 store during late December 2008 - February 2009. (ECF No. 127 at 4.)

32.    In January 2009, Shrestha became ill and was hospitalized in Moses Lake for gangrene in his foot. Mr. Shrestha was released at the end of January 2009, and Patricia Wride began treating Shrestha's gangrene at the apartment shared by Shrestha, his wife, and Rana.

33.    Wride treated Shrestha five times a day for a month beginning January 25, 2009. During treatments, she learned from Shrestha and Rana that they were both working at the B7 but were not receiving regular wages.

34.    Fearing Shrestha and Rana were victims of trafficking, she began maintaining a record of Rana's work hours. She saw him working daily at the B7. (ECF No. 127 at 9.)

35.    Due to his illness, Shrestha was unable to work at the B7 so Rana

8

worked there daily for two to three weeks alone, from 6 a.m. until midnight. (ECF No. 127 at 8.)

36.  Although the B7 was closed for repair (to the gas pumps, etc.) from February 16 through February 21, 2009, Rana was required to work from 6 a.m. until ten or eleven p.m. on those dates. (Exhibit 101 - July 12, 2011 letter.) (ECF No. 127 at 8.)

37.  Rolando Garza, a daily B7 customer, testified that during a three-month period in 2008, he saw Rana working at the B7 store. Garza later visited him at Rana's apartment. Garza took groceries, fruits, and vegetables to Rana because he had no food. (ECF No. 127 at 9.)

38.  Bains used his business associates, Sanjay Saini and Narayan KC to direct his employees and to terminate Rana. (ECF No. 127 at 13.)

39.  Defendants never reported any hours worked by Shrestha or Rana to the bookkeeper, Ms. Buzzard.*

40.  When requested by Plaintiff in discovery, Defendants produced daily transaction records for the B7 but could not produce any employee time or scheduling records for the station for a period roughly between mid-2008 and mid-2009.

41.  Bains' testimony that "someone" seriously disturbed the records of employee hours worked from the B7 during Rana's term of employment was not believable. (ECF No. 127 at 13.)

42.  The best evidence of the dates and hours Rana worked at the B7 are those contained in the work hours record, Exhibit 101. (ECF No. 127 at 14.)

43.  Rana created the record of hours worked from November 13, 2008, through February 22, 2009, with the assistance of Kultgen, Shrestha,

and Wride. (ECF No. 127 at 3.)

44.  The hours and dates of work in Rana's record, Exhibit 101, from November 13, 2008, through the date Kultgen was fired by Bains in late December 2008, came from Kultgen's copy of the actual B7 employee work schedule Kultgen created and used during that time. (ECF No. 127 at 3.)

45.  The record of hours and dates Rana worked after Kultgen's firing came from Shrestha when he was manager, as seen by Wride when in the process of compiling Exhibit 101. (ECF No. 127 at 8.)

46.  Wride helped Rana prepare Exhibit 101 for the period of February 8 through February 16, 2009 and she handwrote Rana's work hours at Exhibit 101, Page BII 0140. (ECF No. 127 at 9.)

47.  It is a reasonable inference that the dates of work and regular and overtime hours Rana worked at the B7 are those contained in the chart at Exhibit 101.

      Defendants Employed Plaintiff Rana

48.  Defendant Bains hired Rana to work at the B7 store in Moses Lake, Washington, on November 13, 2008. (ECF No. 127 at 14.)

49.  Defendants employed Rana from November 13, 2008, until Bains terminated Rana's employment on February 22, 2009. (ECF No. 127 at 14.)

      Credibility of Witnesses

50.  Rana and the witnesses he called were credible. (ECF No. 127 at 12.)

51.  The testimony of all Plaintiff's witnesses indicates Rana worked at the B7 from dates in November 2008 through dates in February 2009,

      10

1  and was impressive and uniform (ECF No. 127 at 13), contrary to Bains'

2  assertions.

3  52.  Bains' testimony was not credible. (ECF No. 127 at 13.)

4  53.  The Court finds Bains' trial testimony was both conveniently

5  vague and deliberately evasive. (ECF No. 127 at 13.)

6      Plaintiff's Damages: Unpaid Hours and Overtime Wages

7  54.  The Court finds that, from the date of hiring in November 2008

8  through termination in February 2009, Rana worked a total of 506

9  regular and 565.25 overtime hours, for which he was only paid

10  $2400.00.

11              **III. CONCLUSIONS OF LAW**

12      Jurisdiction and Venue

13  55.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29

14  U.S.C. § 216(b) over Plaintiff's Fair Labor Standards Act, 29 U.S.C.

15  §§ 201-219 ("FLSA") claims. (ECF No. 20 at 2.)

16  56.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. §

17  1367(a) over Plaintiff's state law claims because these state law

18  claims form part of the same case or controversy under Article III of

19  the United States Constitution. (ECF No. 20 at 2.)

20  57.  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and

21  (c) because a substantial part of the events or omissions, as

22  described below, giving rise to Plaintiff's claims occurred in a

23  business operated by Defendants in the judicial district. (ECF No. 20

24  at 2.)

25  58.  Defendant Bains Investments, Inc., is a Washington corporation

26  that at all times relevant hereto owned and operated the B7 in Moses

27

28      11

Lake, Grant County, Washington. (ECF No. 20 at 2.)

59. At all relevant times, Defendant Bains and the B7 operation constituted an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s) and 29 C.F.R. § 779.22(s)(5). (ECF No. 20 at 3.)

60. At all relevant times, Defendant Bains Investments, Inc. was a gasoline service establishment with annual gross volume of sales not less than $250,000 such that it was an enterprise engaged in commerce as defined by 29 C.F.R. § 779.22(s)(5). (ECF No. 20 at 3.)

61. Plaintiff Rana was an employee of Defendants within the meaning of 29 U.S.C. § 203. (ECF No. 127 at 12.)

Violations of Fair Labor Standards Act of 1983

62. The Court finds Defendants violated the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et. seq. by failing to pay Plaintiff minimum and overtime wages. (ECF No. 127 at 14.)

63. The Court takes notice the federal minimum wage was $6.55 per hour for regular pay during the relevant period. (ECF No. 127 at 14.)

64. The Court finds Defendants failed to comply with record keeping requirements under 29 U.S.C. 211 (c) and regulations promulgated thereunder because they failed to maintain records of Plaintiff's employment.

Violations of state law

65. The elements of Plaintiff's state claim under RCW 49.46 and 49.52 follow those of the federal claim, so that proof of the federal claim proves the state claim.

66. The Court finds Defendants wilfully and intentionally violated Washington state wage laws found at Chapter 49 RCW (RCW 49.46.005 et.

12

seq.) by failing to pay Plaintiff minimum and overtime wages as required. (ECF No. 127 at 14.)

67.  The Court takes notice that the state minimum wage was $8.07 per hour until 12/31/2008, and $8.55 per hour until the end of Plaintiff's employment.

68.  Defendants violated their legal duty under Washington state wage laws and regulations to maintain complete and accurate records including amounts paid, rates of pay, amounts paid per pay period, and the number of hours Plaintiff worked.

69.  Because Defendants failed to maintain complete and accurate records of the hours Rana worked, as required by both state and federal law, Rana was required to prove by "just and reasonable inference" the number of hours he worked.

70.  Plaintiff met his burden of proof through the admission of Exhibit 101.

71.  During Rana's employment at the B7, Bains or his agents authorized cash payment to Rana in the sum of $2400.00. (ECF No. 127 at 14.)

72.  Based on Rana's work record at Exhibit 101, Rana is owed the following in earned unpaid wages:

| **November-December 2008** | | Fed. Wage | WA wage |
|---|---|---|---|
| Regular hours worked | 301.0 | $1971.55 | $2429.07 |
| Overtime hours worked | 215.50 | $2118.37 | $2607.71 |
| Totals | 527.0 | $4158.70 | $5121.52 |

///

**January-February 2009**

13

| Regular hours worked | 205 | $1342.75 | $1752.75 |
| Overtime hours worked | 349.75 | $3438.05 | $4487.29 |
| Totals | 554.75 | $4740.80 | $6239.94 |

Combined totals              **Fed. Wage**

| | Reg wages | $3313.3 |
| | Overtime | <u>$5556.42</u> |
| | **Combined** | **$8869.72** |

| | **State Wage** | |
| | Reg wages | $4181.82 |
| | Overtime | <u>$7095.00</u> |
| | **Combined** | **$11,276.82** |

73. The amounts above are the total before crediting Defendants for the $2400.00 cash payments made to Rana while he worked at the B7.

74. Plaintiff is owed unpaid regular and overtime wages of $6469.72 under federal law. Under Washington law, he is owed $8876.82 in unpaid regular and overtime wages.

75. Rana is entitled to judgment in his favor under both his federal and state law claims, but is only entitled to one recovery of actual unpaid wages. He may claim the higher amount under Washington state law of $8876.82.

<u>Liquidated and Exemplary Damages</u>

76. Defendants did not assert any affirmative defense that they acted in good faith or were simply careless or negligent in maintaining Rana's employment records. (ECF No. 127 at 15.) Nor did Defendants provide any evidence at trial that the failure to pay was anything

14

other than the deliberate and intentional refusal to pay Plaintiff.

77.  Defendant Bains had actual or implied knowledge through his managers that Plaintiff was being paid infrequently and "under the table" in cash.

78.  Defendant Bains, an experienced business owner, knew or was required to know better than to conduct his business the way it was done.

79.  Defendants acted wilfully and with intent to deprive Rana of regular and overtime wages under Washington state wage laws, entitling Rana to exemplary damages under Washington state law.

80.  Rana is therefore entitled to recover exemplary damages of a judgment for twice the amount of wages wrongfully unpaid, for a total of **$17,753.64**, plus the costs of the lawsuit and attorney's fees. RCW 49.52.050; RCW 49.52.070.

     The Court finds the Defendants are jointly and severally liable for the judgment.

     **IT IS SO ORDERED**. The District Court Executive is directed to enter this Order and forward a copy to the parties.

     DATED this 12th day of March, 2012.


                              S/ James P. Hutton
                         JAMES P. HUTTON
                         UNITED STATE MAGISTRATE JUDGE


FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 15